## Fey Will

Exceptions before Zavarella, Adm. J., Eunice Ross, Schwartz, Watson and Rahauser, JJ.

*Ronald M. Buick*, for proponent

*Ray Lochner*, for contestants and next of kin.

*John M. Banke*, for next of kin.

OPINION BY EUNICE ROSS, J., APRIL 29, 1980:

The court must determine whether the paper writing dated April 17, 1978, and admitted to probate June 16, 1978, was the last will and testament of Mary I. Fey, a resident of Allegheny County, Pennsylvania, who died June 8, 1978, aged 93. The writing bears the signature of Mary Fey as testatrix and of Elizabeth Snyder and Thomas A. Dougherty as witnesses.

The writing after a bequest of $2000 for masses gives the residue of decedent's estate to Elizabeth Snyder, decedent's niece.

The petition *sur* appeal filed August 22, 1978, raises three grounds for setting aside the decree of probate:

(1) decedent's alleged lack of testamentary capacity at the time of execution due to generalized arteriosclerosis;

(2) the procurement of the writing by undue influence praticed on decedent by Elizabeth Snyder and her brother-in-law Albert A. Boss, the named executor; and

(3) forgery.

Contestants are Anna D. Ruhe and Mary S. Ruhe, nieces of decedent who each claim a one-eighteenth share of decedent's estate by intestacy. Other intestate beneficiaries are nieces and nephews, Marguerite Ruhe, Charles Ruhe, George Ruhe, Dr. Joseph R. Ruhe, Gertrude Snyder Schorr, Edna Snyder Boss, Walter Snyder, Cecelia Snyder Haver, John Snyder, Mercedes Snyder Sabo, Marian Fey Vidmer, John H. Fey, Anna Fey Shelley, Celesta Fey Rawlins, Ursula Kerins and the proponent, all with a one-eighteenth interest.

In resolving the issues before it, the court will consider the pleadings, the record of the hearing held June 27, 28, 29, 1979, and September 5, 6 and 7, 1979, and the depositions of Lester H. Botkin, M.D. and John Shaver, M.D., admitted by stipulation. At the hearing the issue of forgery was removed as a ground for invalidating probate.

Contestants presented the testimony of Mary Ruhe, Marguerite Ruhe, Charles Ruhe and George Ruhe and also called for purposes of cross-examination Thomas A. Dough-

erty, Esq., (attorney for the estate), the executor Albert Boss and his wife Edna (decedent's niece) as well as the proponent Elizabeth Snyder.

The proponent presented the testimony of Mary Vidmer, Cecelia Haver, a cousin Gertrude Heck and Jerome Funk, a plumber—acquaintance of decedent.

Since the issue of forgery is removed from this case, the questions for adjudication remaining are whether Mary Fey had testamentary capacity and whether the will was invalidated by reason of undue influence exercised on Mary Fey by Albert Boss and Elizabeth Snyder.

The court will first consider the issue of undue influence and notes in doing so that the petition *sur appeal* did not allege a confidential relationship between decedent and proponent although the contestants argue in their written memorandum that proof of such was adduced thereby affecting the burden of non-persuasion and placing it on proponent.

"To constitute undue influence sufficient to avoid a will there must be imprisonment of the body or mind, fraud, threats, misrepresentation or physical or moral coercion to such a degree that the mind of the testator is prejudiced and his free agency is destroyed, and these operate as a present restraint in the making of the will": *Hollinger's Est.*, 41 A.2d 554, 555, 556.

Generally, the risk of non-persuasion as to the existence of undue influence is on the proponent but once the presumption of no undue influence is raised by the introduction into evidence of the record of the probate of the will, then the risk of non-persuasion shifts to the contestant: *Estate of Clark*, 334 A.2d 629, 631; *Abrams Will*, 213 A.2d 638, 641; *Kerr v. O'Donovan*, 134 A.2d 213, 217.

In the case before the court the record of probate was introduced at the hearing and therefore, the burden of persuasion as to the existence of undue influence practiced by Albert Boss and Elizabeth Snyder on the decedent shifted to contestants. The court finds there was an absence of direct proof of any imprisonment of the body and mind of the testatrix, of fraud, threats, misrepresentation or physical or moral coercion which prejudiced the mind of the testatrix and

destroyed her free agency. Thus, a non-suit as to contestants would be proper on that ground but they assert that the record establishes that Betty Snyder (or her agent Albert Boss) stood in a confidential relationship to decedent who was of weakened intellect and that Betty Snyder received the bulk of decedent's estate (which third fact all parties admit) and that "where (1) a person in a confidential relationship (2) receives the bulk of a testator's property (3) from a testator of weakened intellect, the burden of proof is upon the person occupying the confidential relation to prove affirmatively the absence of undue influence": *Estate of Clark, supra,* 632. See also *Estate of Reichel,* 400 A.2d 1268, 1269, where the court on page 1270 set forth the contestants' burden of proof in such cases as requiring "clear and convincing evidence."

Were a confidential relationship and testatrix' weakened intellect proved by clear and convincing evidence in the case at hand? A confidential relationship appears when the circumstances make it certain that the parties do not deal on equal terms but rather on 'the one side there is an overmastering influence and on the other weakness, dependence or trust justifiably reposed: *Estate of Clark, supra,* 633. The relationship exists when the testator gives to the other such power over his business affairs that the other is in a position of trust and may take no unfair advantage of decedent: *Estate of Clark, supra,* 633-634. Even where the confidential relationship is proved, it must be coupled with proof of weakened intellect, that is, lack of strength as to the testator's mind so that he lacks the force of will to carry out his own desires and submits instead to the will of the confidants in disposing of his estate. Thus, weakened intellect need not be so great an impairment as lack of testamentary capacity: *Estate of Clark, supra,* 633.

The court will look at the facts of the case to determine if clear and convincing evidence established that Betty Snyder, the residuary beneficiary, and/or her agent, Albert Boss, stood in a confidential relationship to decedent and if decedent was of weakened intellect so as to invalidate the testamentary writing which gave the bulk of decedent's estate to Miss Snyder.

Decedent had long resided with her brother, Joseph Fey, who on March 24, 1978, predeceased her. Betty Snyder had lived wih Joseph and Mary for 28 years before their demises. Betty moved in with her uncle and aunt when in her forties, kept the house and helped pay bills and do other chores. For this she was paid a salary. When alive, Joseph conducted the pair's business affairs, buying a variety of securities, managing his own investments and privately discussing them with decedent.

After his March 1978, death, his incomplete 1977 income tax return was on the dining room table and on at least one occasion Mary Fey reviewed it.

All witnesses agreed that all her life Mary Fey was a stubborn person with a mind of her own who did exactly what she wanted. She paid her own bills. Sometimes Betty Snyder wrote out her checks for her but Mary Fey always signed them.

Neither before nor after Joseph's death did Mary Fey discuss her business affairs with anyone, including Betty Snyder. Her important papers were kept in a safe in Betty's room and Betty knew the combination. Mary Fey was not a conversant person. She was hard of hearing and had to be addressed in a voice louder than normal. She often responded in a few words or short sentences. In later years she developed slight hand tremors but until her death she recognized all her visiting relatives and seemed to understand them and they her. While not talkative in general, she could and did communicate with those around her.

In November, 1977, Mary Ruhe visited the household of Mary and Joseph Fey and extended an intended short stay to one lasting until the death of Mary Fey.

Joseph's death in March, 1978, upset Mary Fey and a few weeks later she asked her niece, Edna Boss, if she knew an attorney. Edna said she knew only of Thomas Dougherty, Esq. Decedent asked if Edna's husband Albert would help her and if he would call Mr. Dougherty. Edna Boss said she was sure Albert would help and relayed decedent's request to him. After discussing the matter with Mary Fey, Albert called attorney Dougherty, a remote relative who had

handled his mother's estate, and told him Miss Fey needed counsel for her brother's estate. He arranged for Dougherty to meet decedent April 17, 1978, in the evening.

On April 16, 1978, Betty Snyder telephoned Albert to say Mary Fey wanted to see him. She said she did not know why. When Albert arrived at decedent's home, she was in the kitchen. Betty Snyder was also there. Decedent asked him to come in and told him she wanted to write a will. He suggested she await the conference with Dougherty the next evening but decedent said an attorney was not required to write a will and she wanted Albert to do it. He asked what she wanted done and she said she wanted money left for masses and the rest to go to Betty Snyder. On that night Mary Fey said she wanted "no Feys" and "no Ruhes" in her will.

Mary Ruhe was not at Miss Fey's home on April 16, 1978.

Albert typed the requested will at work. The next evening he went to Mary Fey's home first followed by attorney Dougherty. Betty Snyder, Mary Ruhe and decedent were home. Mary Fey, Albert Boss, the attorney and Betty Snyder went to the dining room. They neither invited Mary Ruhe nor excluded her. She did not ask or try to accompany them.

Dougherty believed he was present to discuss Joseph's estate and read Joseph's will which left everything to Mary Fey, the named executrix. He explained her fiduciary duties and her right to renounce them. She indicated she wished to renounce her right to administer in favor of Albert and Dougherty agreed to execute the papers.

He then told Mary Fey she received all Joseph's estate and should write a will. With Mary Fey's assistance and that of Betty and Albert he prepared a list of intestate next of kin and explained her existing will in favor of Joseph would be ineffective. Then Dougherty was given the will prepared by Albert Boss and compared it orally with the prior will of Mary Fey, not reading them word for word. Then Mary Fey and the witnesses executed the probated writing. Dougherty intended later to prepare a revised will with a tax clause and a provision for contingent beneficiaries.

During the conference, Mary Fey sat between Albert Boss and Dougherty. Betty Snyder sat across the table.

A week later Betty Snyder was hospitalized and later went to stay with her sister, Gertrude Schorr, while recuperating.

On June 6, 1978, when Mary Fey was ill to the point where she required nursing care, she signed three checks dated June 7, 1978, transferring her sole bank accounts to joint accounts held with Albert Boss. Albert testified the money was to be used by him to pay the nurses. He never before had joint accounts with Mary Fey and transferred the balance therein to her estate upon her death.

The gross estate of Mary Fey was about $274,000 and it is clear Betty Snyder received the bulk thereof under the probated writing.

The contestants, however, failed to show by clear and convincing evidence either that Betty Snyder or Albert Boss as her agent stood in a confidential relationship to decedent or that decedent was of weakened intellect.

In making its determination this court considered the testimony of all witnesses including those called by contestants for purposes of cross-examination. The testimony of such adverse witnesses binds the contestants unless it was clearly rebutted: *Golda v. Gillen*, 176 A.2d 903,905; *Rogan Est.*, 171 A.2d 177,180.

Betty Snyder was called as for cross-examination by contestants. Although Betty Snyder lived with the decedent for twenty-eight years, the only testimony presented by contestants directed toward a confidential relationship between Betty Snyder and Mary Fey was that often Betty would write out checks for Mary (although Mary looked at the bills and signed the checks), that often she brought in the mail and that she deposited checks in the bank. While Joseph Fey was alive she often went to the bank with him. At one time she had a joint box with Joseph Fey and when he was in the hospital she transferred bonds from the joint box to her box at his direction. Joseph made gifts of certain bonds to her. She knew nothing about Joseph or Mary's specific investments, knew nothing about the cumulative

values of their respective estates, had never discussed their wills with them and only on one occasion did she see Joseph Fey's will, when Mary Fey asked her to read it after Joe's death. Also by Betty's testimony which binds contestants she asked Mary Fey on April 16, 1978, if she did not want to leave anything to anyone else.

Contestants have failed to prove by clear and convincing evidence the existence of a confidential relationship as to Betty Snyder or Albert Boss and decedent. The only transactions handled by Boss prior to Mary Fey's death were the filling out of certain medicare forms (he worked in a hospital). He also copied a 1977 tax return prepared by Joseph Fey. However, according to Boss he had no knowledge of the financial affairs of either, never advised them as to investments, never held joint accounts except the convenience account of June, 1978, and never discussed disposition of their estates. While Albert Boss was someone Mary Fey trusted and believed to be reliable, no evidence exists that she ever took him into her confidence as to her personal and business affairs in general other than those isolated transactions.

The most significant thing Albert Boss did was to arrange for Thomas Dougherty's appointment and to type decedent's will. However, the record is devoid of any discussions between Betty Snyder and Boss that permit a finding that Boss was Betty's agent in a confidential relationship between Betty Snyder and Mary Fey. The mere fact that Boss's wife was Betty Snyder's sister is not determinative in proof of him as such an agent.

There was no confidential relationship between Boss or Snyder and decedent but even if there were, contestants failed to prove by clear and convincing evidence that decedent was of weakened intellect.

All the witnesses agreed that Mary Fey was a stubborn person who knew what she wanted. The most contestants proved was that Mary Fey was grieving over Joseph's death and at times seemed not to believe he had died. She also had hearing problems and was not an extensively vocal person.

However, she recognized and knew the persons around

her. This included not only recognition of her relatives, but also of at least one acquaintance, Jerome Funk, a plumber who went to check Mary Fey's leaking faucet in May of 1978, and went again to check her hot water tank. Funk, who has no interest in the outcome of the case, testified that Mary Fey knew him, understood what he told her about the hot water heater, and gave her approval for him to arrange for another plumber to fix it.

According to the deposition of Dr. Shaver who examined Mary Fey in November, 1977, Mary Fey knew him, knew the nature of her medical prescription, wrote her own check to pay for the visit. He found her to be quite alert and cognizant as to those things that were important in the doctor-patient relationship.

By the testimony of contestants' witnesses, Mary Fey, in May 17, 1978, gave her brother Joe's ring to Charles Ruhe. Mary Fey knew Charles Ruhe, knew she was giving him Joe's ring, realized the ring did not fit and was very clear in her intent in wanting Charles Ruhe to have the ring. This was her state of mind approximately one month after the execution of her will.

Contestants contend it is sinister that the April 16th meeting between Fey, Snyder and Boss occurred when Mary Ruhe was not at home. One may speculate as to why that night was chosen but it is unimportant because the next evening, when the will was executed, Mary Ruhe was in the house. While contestants claim that something happened during that time that was coercive, no evidence exists to prove the same. If Mary Ruhe had been truly concerned, she could have joined the others to make sure that no evil was about.

No evidence exists of Betty Snyder's concern about her own gain. While she testified that she had always been told she would be taken care of she did not really have that on her mind. In fact the contestants may have been even more concerned. Edna Boss testified that the day after Joe's funeral, Mary Ruhe asked her about selling Joe's car to someone.

George Ruhe, after testifying he had never expected anything, admitted to a letter he wrote to Betty Snyder demanding payment for all he had done.

Contestants have not raised a prima facie case of undue influence since no weakened intellect or confidential relationship was proved. Also, proponent presented clear and convincing evidence to the contrary. The court finds the testimony of Albert Boss and Betty Snyder was credible. Boss's explanation for the transfer of funds to a joint account more than six weeks after the will was executed was logical in the light of Mary Fey's then need for assistance. While such an action might import a confidential relationship, it occurred long after the signing of the will. Again, weakened intellect was not involved.

The remaining issue is whether Mary Fey at the time she signed the probated writing had testamentary capacity.

Once proponent introduced the record of probate into evidence, contestants had the "duty to come forward with evidence" proving decedent's lack of testamentary capacity: *Masciantonio's Est.*, 141 A.2d 362, 365. Contestants failed to produce a shred of clear and convincing evidence that at the time of execution of the probated writing testatrix failed intelligently to know the general objects of her bounty, the general compostion of her estate and what she wanted done with it: *Estate of Reichel, supra*, 1270.

The appeal of contestants will be dismissed.